2011, 5-0, 4-0, MECKLER v. United States 2011, 5-0, 4-0, MECKLER v. United States 2011, 5-0, 4-0, MECKLER v. United States 2011, 5-0, 4-0, MECKLER v. United States Good morning and may it please the Court. The Court of Federal Claims committed two errors that require reversal here today. First, the Court found that the release at issue here was freely assignable and transferrable, a finding which was in violation of the rule recognized in Rome Polonque, which states that patent licenses are not freely assignable and transferrable unless explicitly made so. In finding the release was assignable, the Court of Claims relied on the phrase, and this is at JA 41 for this specific release, and with the right in MDC to grant the same license to the U.S. government and to others as required by commitments of MDC. By relying on this language, the Court of Claims conflated a limited sub-licensing right with an assignment right. Let me ask you a basic question, and I understand where you're going with this. I think we're very familiar with the underlying facts and the contentions, but I have a question that effectively goes to corporate law, really. I mean, suppose what happened here was an acquisition of MDC by Bohm. Okay, a stock swap as I understand it. Okay, suppose that what had happened instead had been that Warren Buffett had decided MDC is a great company and I want to buy 51% of the stock, and he did. He kept the name MDC. MDC would continue to have these rights, correct, notwithstanding that it had a new owner. Correct? I'm not sure about that. Really? Let me... Every day stocks are sold back and forth. Are you telling me that if every day the corporation has new owners because the California pension fund has just sold its stock and the New York pension fund has bought it and it suddenly loses these rights? Well, no. Assuming the corporate entity survived, I think that's correct. Yeah, the corporate entity survived in that case. Now, he decides, you know, I really like the name Berkshire Hathaway, and so I'm going to rename my new acquisition the McDonald Division of Berkshire Hathaway. And in fact, I'm going to bring it under the umbrella of Berkshire Hathaway, right? I'm going to appoint directors who are directors of Berkshire Hathaway, et cetera. Still, the division continues to own this property, right, or have this license. Again, assuming the corporate entity survives, the division would continue to maintain the rights. So, why hasn't the corporate entity survived? Is it a change in the name? What's the change? What's the magical event that converted McDonald Douglas into something that no longer had its same licenses and so forth? Well, as I understand it, and, you know, a lot of this isn't in the record below. Right. But as I understand it, it was merged into Boeing. Well, it was, but that's my Berkshire Hathaway case. And it's merged in the sense that, you know, you're now part of the great Berkshire Hathaway entity. But that wouldn't change the fact of what their various license rights and property rights and so forth would be, would it? Well, I think you just raised two separate issues. I think it would change license rights, and I think that's what Roan belongs to. At what point? At the point at which the name changed? I think at the point where the corporate entity ceased to exist. Well, wait a second. I think the point that Judge Bryson is trying to make here is that there's a distinction. Is there not between a stock transfer and an asset transfer? Exactly. That, you know, if you have two corporations and they decide that they're going to do an asset transfer deal, then one corporation would transfer and assign all of its assets or the designated assets to the other corporation, which would require some sort of a transfer document. And that's to be distinguished from a stock transfer where the ownership, if you will, of the corporation could change overnight, but the assets are still held by the same company. And isn't that what we have here, that the license is an asset that was possessed by MDC before the merger, and why is it not held by Boeing standing in the shoes of MDC because of the merger? Well, I think, well, there's a couple of responses there. First, again, we don't know the precise nature of the merger that took place back in 1998, so that's not in the record. Well, let's assume that it was a stock transfer. It was. Fair enough. If it's not in the record, let's assume it. Okay. And go forward and tell us how that would play out. Judge Winn has put the question much better than I did. Fair enough. The answer is not mine. And just as I understood that transaction, there was a holding company of sorts created, and the actual full transfer to Boeing didn't take place until sometime in 2008. But again, that's just kind of my independent research that uncovered that. But to answer your question, the issue is that it would provide, it would be a dangerous rule to set if a company could acquire a patent license merely by acquiring another company. No, but the point that I was trying to make is that nobody acquired anything. The stock transfer simply changed ownership. The same corporation, albeit in its merged form, holds the same asset that it held the day before the merger. But doesn't that raise the same issue, though, that just by a clever structuring of a business transaction, you can get around the rule of assignability that prohibits the general assignability of patent licenses? You're not suggesting that the hundreds and probably thousands of contracts that MDC had the day before the merger somehow got left behind unless each and every one of them was assigned somehow to Boeing? Well, I think that... The lone patent license is unique. Yeah, that... And at the point, I mean, the Rome Belong makes clear that ordinary contract law doesn't apply. That's exactly correct. I'm a little confused because it sounds to me as if the colloquy you're having with the court is sort of saying, well, maybe there's an alternative ground on which to support what happened here. Let's talk for just a second about how the Court of Federal Claims got where it got. In the paragraph that you pointed to earlier, the Court of Federal Claims is saying, and I don't read the release in this invention to say that MDC became Boeing. Yes, that's correct. That's on JA10. That's... Yeah, it's JA10. It's page six of the opinion. So in the first sentence in the first full paragraph there, the court is, as I understand it, is not accepting the analysis that's been talked about here, which is that ipso facto, when the merger took place, MDC just became Boeing and there was not to worry. Now, how did the Court of Federal Claims get the license to move? So, yeah, what... Was it through the commitment language? That's exactly right. The language that I mentioned right at the beginning and with the right in MDC... Just tell me, how did... Were we doing a decision by the Court of Federal Claims? The Court of Federal Claims said that the license is now in the hands of Boeing. Yes. On its face, it was in the hands of MDC with a right to sublicense under certain conditions. And what... Yeah, and what the court below held was that by operation of the merger, the assets, one of which was the license regarding the sensor, became Boeing's assets. And it... Is that because in the mind of the court there was a, quote, requirement and obligation of MDC to do that? No. The court's rationale was that the assignment... that an assignment took place which was permitted by the language in the agreement. And that language that was relied on is what I referred to earlier as a limited sublicensing right. And with the right in MDC to grant the same license, the U.S. government to others is required... But the U.S. government is not there. It's to others. Yeah, and to others is required. And others meaning to Boeing as required by a commitment of MDC to Boeing, presumably, right? Presumably, yes. Well, is there a requirement in corporate law that when you hold a patent license and you merge into somebody else, you have a commitment to sublicense or to assign that license to that new person? None that I'm aware of, no. But I can't say for sure. I do not know the answer to that for certain. Well, I'm asking the same question that the court had been asking earlier about what happens in the event of this corporate event. Yeah, I don't think... Let's just look at it. Let's assume that the Court of Federal Claims had reason that the merger itself didn't, in a magic way, get the license to transfer to be assigned, if you will, to Boeing. But instead that the Court of Federal Claims thought that there was a commitment that MDC had at the time of the merger to affect the sublicense or the assignment. And your argument is commitments don't necessarily... I didn't understand you to contest that theory, but simply to say that you believe commitments were only the commitments that exist at the time that the sublicense was granted, the grant back. That's correct. The commitments are limited to the time of the relief. Why is that? The word commitments is broad. It can be broad. If you saw the word commitments in a patent, and it didn't say past, or it didn't say present, or it didn't say future, it just said commitments, we would read it to include all three. Well, I think it would depend on... In a patent, I assume you're talking about a patent claim. In that instance, we'd look to the specification. What is there in this nine, ten-sentence long, ten-line long provision in the contract? What is there in there that says commitments is somehow narrow? Well, I think there's nothing that explicitly says that. But I think you have to keep in mind that this is a patent license. And this court, in past cases, were confronted with similar issues. UNOVA, for example, Franklin Federal, not a patent license, but a contract nonetheless, hasn't been willing to broaden the temporal meaning of words without some language or some definition that provides for that. What do we make of the fact? I know Mr. Hornback was pro se, but nonetheless, he made a concession that Boeing does have a license and then argued that the scope of the license did not extend as far as the defendants of contention. That seems to me a concession on the record that you're bound by. Don't you agree? Which concession? I'm reading from JA 139. It says Boeing does have a license, dot, dot, dot, dot. Sure. He says, well, but the license is not. He has a theory, which is a very narrow reading of the license, essentially that NBC has a right to sell to its own subsidiaries, et cetera, but not beyond that. But he's conceding that the license passed to Boeing, as I read his pleading. Well, I don't think that's really the proper subject of an admission because really that statement is premised entirely on a misunderstanding of the legal effect of the merger. Well, that's one way to say it. The admission should not have been made because of its premise on misunderstanding, but that doesn't make it any less of an admission, right? Well, if it's contrary to law, I think Glen Eyre and the Chicot case we talked about in our briefs suggest that in 12b-6, the court is obligated to accept the truth of facts asserted, but not legal assertions. And it's our position that what that is is a legal assertion because the entire basis for the statement was grounded in a misunderstanding of a legal document, the contract. Okay. Now, you're well into your rebuttal. Would you like to say that and we'll start your formal rebuttal. Thank you very much. Thank you. Appreciate it. Ms. Mitchell. Thank you, Your Honor, and may it please the court. I'm Susan Mitchell here representing the United States. As the court has clearly talked about with plaintiff's counsel, there are two issues before the court that have to be decided to determine whether or not the trial court should be affirmed. And one of those issues was not contested below, and that issue is whether the license that was transferred to Boeing was transferred to Boeing in the merger or not. And as Judge Bryson pointed out, Mr. Hormack did not contest that below, but said, yes, the license did transfer in the merger. Just for purposes of argument, let's take the so-called concession off the record. Okay. Assume that I don't hold the pro se litigant to the concession. Now, explain to me how the Court of Federal Claims minus the concession, how did they get the license from MDC to Boeing? How did it travel? I think the court on JA-9 really talked about the cases where in a merger some license passed, some do not. This particular license is akin to a concession. Are you relying on the language in the license that said a commitment to others as required by commitments? I mean, that's certainly one way. I want to know how it happened. Well, in a merger, as the trial court pointed out, and certainly in California Labs versus Gould and PPG Industries, when there is a merger and there's a transfer of all assets, equitable rights transfer. So shop rights do transfer even without a written assignment. Those are deemed to transfer. But doesn't that depend on the state law and what the state law provides? You are correct, Your Honor, that the state law does. What state law applies here? The plaintiffs have posited California law. I mean, that's not certainly in the record below or decided which law applies. Isn't it also a question of corporate law? The corporate law of Washington or Missouri and probably not California, right? Right, right. And at this juncture, I wouldn't posit one law or the other. But in terms of I don't think the state's laws, as I understand merger, are that distinctive to say that this type of merger where all assets were transferred to Boeing. Well, it's not assets, right? Again, I don't know the extent to which somewhere in this record there is a reference to the nature of the transfer. But let's assume it was a stock swap. That's not actually an asset purchase, right? That is basically a change in ownership of the corporation. Yes, Your Honor. And certainly, as Your Honor posited before, that type of transfer certainly should not negate this type of covenant not to sue. That's very generally entered into when an employer pays for the making of an invention. As McDonnell Douglas paid in this instance, certainly paid Mr. Hornback's salary, provided the facilities, and had a contract with Mr. Hornback where he transferred all the rights to NDC. And certainly, NDC had, out of its largest, gave the rights back to Mr. Hornback and kept, certainly protected its own interest in an invention that it had paid for development, and kept the covenant not to sue, and also kept a very specific right to grant others, such as the U.S. government, the same license. My question remains, how do we know what was in the mind of the Court of Federal Claims when they decided that the license was transferred? Well, I think the Court of Federal Claims, Judge Bush set it forth on page JA-9, where she talks about the merger of corporations, and sometimes licenses such as this are passed and sometimes they're not. And she deemed that certainly, in looking at the clause with the right in NDC to grant the same license to the U.S. government and others as required by commitments of NDC, this set forth the intent that surely this type of, that this license was transferred. In other cases, merger will not complete the transfer if a license restricts assignment. This license does restrict assignment. It provides for the terms and conditions under which assignment can be made. Well, certainly in the case... Isn't that correct? Look at the license language. Yes, Your Honor. Okay. They reserve a royalty-free license to make, use, and sell to their subs and affiliates with the right of them to grant the sub license to the U.S. government and others required by commitments of NDC, period. Yes, Your Honor. That's a restriction. It's not freely transferable by NDC to anybody they want for any reason. I agree. I'm trying to get at it. I can't, I do not frankly know what was in the mind of the Court of Federal Claims when they decided that this license traveled to Boeing. Well, I think certainly a person for... Unless it's through the, by the commitments. Certainly. I think she did rely on that particular provision. Well, can you find, can you tell me any other way that the court, given the explanation that the court had, that a merger won't do the job? And that's her answer to the colloquy you've had with my colleagues here earlier in the day. If the transfer license restricts assignment, and it does, then how can you defend what happened here except through the notion that BDD had a commitment, others was Boeing, they had a commitment to Boeing to transfer the license. I think, Your Honor, that's certainly a way to say... Is there any other way? Well, I mean, the court did say, I mean, she specifically said, plaintiff concedes that Boeing has the license reserved. I said take that out of the case. Right, I mean, that's her other way. I'm sorry. That's the other way. Other than the concession, is the government's view that there was any way for this license to get to Boeing except through the others as required by commitments language? Well, I think to back up the general rule... Yes or no? Well, I do think that the general rule that Ron Plonk has, that states, really only applies to transfers that really aren't evidenced, don't have a writing for the agreement. I mean, that's sort of the non-transferability. You agree with the general proposition that the license is not... The license is personal to MDC, and it can't travel except on the terms and conditions of travelability that exist in the license. And I don't think that... Do you agree with that statement? I don't think that's necessarily true. I mean, I do understand that licenses are generally personal to you, but you really do look at the terms of the agreement. I don't think that Ron Plonk, at least under the General Mills case, says that if there's a writing, that general premise doesn't apply when you have a writing that you can look at when you have a contract in writing. And this isn't the agreement that McDonnell Douglas entered into with the inventor of the license? Yes, I mean, it really is. They said, Mr. Hornback, we give you back your entire invention here. We're retaining. And we're retaining a license, a patent license. Yes, Your Honor. They retained a non-exclusive license. Doesn't that put that document right into the heart of Ron Plonk? I think as far as I understand the Ron Plonk decision and the General Mills decision, that when there's a writing, then you certainly look to the writing to determine whether or not there can be whatever... Whether there's travelability, whether there's assignability. Right, right. And when you look in this document, where do you find the right for the license to travel except through the language that says it's to MDC and it's subbed with the right in them to grant the same license to the U.S. government, right? Right. I mean, this license goes to them and their subs and affiliates. So that's part of the sub license right down from MDC to Hornback. Hornback, pardon me, back to MDC. Right. So same license to the U.S. government. They're out of here. Or to others as required by commitments. I do think that language does, the commitments of an MDC, Your Honor, is positive. Okay, so you argue in your brief that commitments have to be, has to be broad. Yes, Your Honor. That's right. It includes past, present, future commitments. Yes, Your Honor. How do I know that? How do you know that? Well, I think the case law relied on by the plaintiff to say that you really can't read in future into this term. Commitments really doesn't get them where they need to go. Aren't you defending your interpretation of the word commitments by saying, well, we know that it was just only the commitments at the time? Well, certainly.  Aren't those facts? Well, at the time, there were no commitments of MDC. So it makes no sense to read this to say commitments at the time that this was signed. I mean, Mr. Hornback states certainly unequivocally that he knew, and I believe that is in the complaint, that there were no commitments to MDC at the time to make this technology. So clearly it has to envision something. That might suggest that it necessarily has to be future commitments. Right. I mean, that they would at least have contemplated. I mean, certainly, too, the word permanent. It's a reservation of a permanent royalty-free, non-exclusive license. I mean, that certainly would evidence the fact that they were thinking this is just a general reservation of a covenant not to sue with the inventor. And that would almost always generally be read in the future. I mean, those are types of paid-up licenses that the government asks for all the time in these types of cases. This is exactly that type of license. One of the things that the plaintiff is asking for here is for us to upset the dismissal with prejudice and to say there was a dismissal without prejudice, which presumably would give him the right to amend his complaint. And he's saying he'd like to do that. And one of the things he'd like to do when he amends his complaint is to allege that the release did not transfer to Boeing, which he hasn't clearly said in his current complaint. I'm looking now at page 41 of the blue brief where he lays out the three possible grounds on which he would amend his complaint if he had an opportunity to do so. But what he's saying there is, well, I don't think it transferred. I'd like to have a trial on this issue on this word commitment. And presumably he's saying, I'd also like to have a trial on whether the theory of the Federal Circuit about how the merger itself might have done the job, whether that's, in fact, true under corporate law. Well, I think, Your Honor, and taking the record as it stands, and I know originally you said take out the admission, but certainly this was not contested below. And now because there are counsel involved, they want to basically sort of rewrite what was done below and say there is no admission. There is an element here of a pro se person. You get to get a do over once you get good counsel. Right. But, you know, slack has been cut to pro se litigants before. This wouldn't be the first time. No, I do understand that, Your Honor. But certainly, I mean, Mr. Hornback premises this whole infringement sort of argument on the fact that Boeing had access to his technology. And certainly he agreed to have access. And there is evidence in the record that they actually had his patent application after the merger with NDC that he said there had to be certainly the transfer of license. They had the same license. It's limited. And I don't think it's fair to the government at this point to say, well, we're going to give them a do over because now counsel is going to argue that there is no transfer of the license in the record. Would the issues with respect to assignability and their own polemic aspect of this be relevant at all if, in fact, the transaction that took place between MDC and Boeing was a stock swap and not a transfer of assets? I believe you would be correct, Your Honor, that it shouldn't – I mean, there would be no necessity for any type of writing to transfer, that it would simply still be a part of the assets of the company. And is it your position that that's what took place here, that the MDC-Boeing merger was a stock deal and not an asset transfer? Unfortunately, that particular information is not in the record, that it's just posited that Boeing merged with – or MDC merged with Boeing. So that particular evidence is not in the record. I thought I saw it someplace in the record. You may have. Actually, there is actually a press release, so it may be in the press release. It may be in the press release that Mr. Hornback included as part of his summary judgment statement. And if you did see it, that's where I'm sure you saw it. So I apologize.  I mean, it is hard to tell exactly what was decided by the Court of Federal Claims because the key paragraph on JA-10 talks at one time about assignability, which suggests that maybe this was an asset deal between MDC and Boeing. And at other times, it talks about MDC's assets became Boeing's assets based on the concession that MDC-Boeing now owns the license to the invention. So it's a little confusing to me as to exactly on what grounds the Court of Federal Claims reached the conclusion it reached. Well, I think first and foremost, she did rely on – the trial court relied on Mr. Hornback's admission and then to determine, you know, did Mr. Hornback really attack the scope of the license that Boeing had? But if that was the case, then she would not have had to discuss all this about assets and transferability and the like. I agree. I do think she sort of, as an alternative, looked at that. But, I mean, she definitely relied on the fact on page JA-8 of her opinion. Plaintiff concedes that Boeing has the license reserved to MDC by the release of the invention. But then she goes on to say as a threshold issue, she thought it was important to correctly identify the license possessed by MDC before turning to the issue of the license that may now be possessed. Your motion to dismiss also seems to make the argument that Boeing was an affiliate. We did make that argument. So it seems to me the position you're taking now is a little bit different from the position you took in the motion initially. We certainly did not raise that again on appeal. And we did raise certainly the issues that the Court of Federal Claims relied on in making the decision. And she rejected that argument by the government. We did not reiterate that. You're right, Your Honor. In terms of these concessions, isn't the concession at JA-139, which the presiding judge pointed earlier, the same concession that's at page 148, which is the shop rights license? Yes, Your Honor. He does make that. Right. But, I mean, is that – even if he conceded that he thought maybe Boeing had a shop rights license, is that necessarily fatal to his case? Because Boeing here is allegedly using this license for more than shop rights. I would disagree with that, Your Honor. I mean, basically the allegations are that Boeing is making a seeker that allegedly infringes Mr. Hornback's patent. And shop rights would allow you to use the particular invention in your business and then sell the final product, as in this case, to the government. And then certainly under first sale doctrine and under Vinton and Hughes, we would step into the shoes of whatever defense Boeing had. And so if Boeing had the license, there's certainly no reason to have to sub-license the government. We would have the rights that Boeing had. So I do think if – and this is akin to a retention of a shop right type license where you have a non-exclusive license to make, use, and sell. And basically you have a covenant not to sue with the inventor. So it is sort of a written statement that's akin to a shop right that would allow certainly Boeing to make that invention, use it in its business, and sell it to the government. Thank you. Did you have any further? I'm sorry. Thank you, Ms. Mitchell. We'll hear rebuttal from Mr. Bennett. I think Mr. Bennett, you had asked for five minutes, and we'll give you the full five minutes. Thank you, Your Honor. We took Ms. Mitchell over a bit, so we'll even things out. Sounds fair. Just a couple points I want to touch on. Ms. Mitchell, she said that it didn't make sense to interpret commitments as being limited to then existing commitments because Hornback stated that he knew none existed at the time of the release. But that argument was advanced and rejected, expressly advanced and rejected in UNOVA. So there it was the exact same situation. You had Compaq, who was a party to the settlement agreement, later acquired by HP. HP tried to hide behind that license, and the license was directed to parent corporations. And HP argued that, hey, you know what? There were no parents for Compaq at the time of the license. It would make no sense to limit it to then existing parents, and the court rejected that argument. So it doesn't seem like that argument should carry the day here. Secondly, Ms. Mitchell referenced General Mills and how it talks about the language of the agreement governing whether a license is assignable. But what she failed to note was that in General Mills there was actually explicit language in that agreement that said it was assignable. We don't have that here. We just have a limited right to sublicense, as we talked about before. And I think that's all I have. Thank you very much. Thank you, Mr. Bennett. If there are no other questions from the panel, we thank both counsel and the cases submitted.